## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| JENNIFER WALLER,<br>*Individually and on behalf of herself*<br>*and all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>TIMES PUBLISHING COMPANY,<br><br>Defendant. | Case No.<br><br><br>**CLASS ACTION**<br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Jennifer Waller on behalf of Plaintiff and all others similarly situated, files this Complaint against Defendant Times Publishing Company ("The Times" or "Defendant") for violation of the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"). Plaintiff's claims arise from Defendant's practice of knowingly disclosing to a third party, Meta Platforms, Inc. ("Facebook"), data containing its digital subscribers' (i) personally identifiable information or Facebook ID ("FID") and (ii) the computer file containing video and its corresponding URL viewed ("Video Media") (collectively, "Personal Viewing Information"). Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.

## I.  NATURE OF THE ACTION

1.      This is a consumer digital privacy class action complaint against The Times, as the owner of *Tampabay.com*, for violating VPPA by disclosing its digital subscribers' Personal Viewing Information to Facebook without obtaining the proper consent.

2.      VPPA prohibits "video tape service providers," such as *Tampabay.com*, from knowingly disclosing consumers' "personally identifiable information," which "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape provider," without first obtaining express consent in a stand-alone consent form. U.S.C. § 2710(a)(3), (b).

3.      Like other businesses with an online presence, Defendant collects and shares the personal information of visitors to its website and mobile application ("App") with third parties. Defendant does this through cookies, software development kits ("SDK"), and pixels. In other words, digital subscribers to *Tampabay.com* have their personal information disclosed to Defendant's third-party business partners.

4.      The Facebook pixel is a code Defendant installed on its *Tampabay.com* website allowing it to collect users' data. More specifically, it tracks when digital subscribers enter the *Tampabay.com* website or App and view Video Media. Defendant's website tracks and discloses to Facebook the digital subscribers' viewed

Video Media, and most notably, the digital subscribers' FID. This occurs even when the digital subscriber has not shared (nor consented to share) such information.

5.     Importantly, Defendant shares the Personal Viewing Information—i.e., digital subscribers' unique FID and Video Media viewed—*together as one data point to Facebook*. Because the digital subscriber's FID uniquely identifies an individual's Facebook user account, Facebook—or any other ordinary person—can use it to quickly and easily locate, access, and view digital subscribers' corresponding Facebook profile. Put simply, Facebook pixel grants Facebook knowledge of the Video Media each of its subscribers view on the *Tampabay.com* site.

6.     Defendant uses the Personal Viewing Information to build more targeted advertising on its website which, in turn, generates greater revenue. Thus, without obtaining consent from its digital subscribers, Defendant profits from its unauthorized disclosure of its digital subscribers' Personal Viewing Information to Facebook. Defendant reaps these secret profits at the expense of its digital subscribers' privacy and their statutory rights under VPPA.

7.     Because Defendant does not inform *Tampabay.com* digital subscribers about this dissemination of their Personal Viewing Information—indeed, it is automatic and *invisible*—they cannot exercise reasonable judgment to defend

themselves against the highly personal ways *Tampabay.com* has used and continues to make money by using their personal data.

8.     Defendant chose to disregard Plaintiff's and hundreds of thousands of other *Tampabay.com* digital subscribers' statutorily protected privacy rights by releasing their sensitive personal data to Facebook. Accordingly, Plaintiff brings this class action for legal and equitable remedies to redress and put a stop to Defendant's practices of intentionally disclosing its digital subscribers' Personal Viewing Information to Facebook in knowing violation of VPPA.

## II.   JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under the Video Privacy Protection Act, 18 U.S.C. § 2710.

10.     This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed Class (defined below) exceeds $5,000,000, and at least one member of the Class is a citizen of a state different from that of Defendant.

11.     Venue is appropriate in this District pursuant to 28 U.S.C. §1391 because Defendant resides in and is subject to personal jurisdiction in this District. Venue is also proper because a substantial part of the events or omissions giving rise to the claim occurred in or emanated from this District.

### III.   PARTIES

12.   Plaintiff Jennifer Waller is an adult citizen of Florida and is domiciled in Pinellas County, Florida. Plaintiff began her digital subscription to *Tampabay.com* around 2018 and continues to maintain the subscription to this day. Plaintiff has had a Facebook account from approximately 2012 to the present. During the relevant time period she has used her *Tampabay.com* digital subscription to view Video Media through the *Tampabay.com* website and/or App while logged into her Facebook account. By doing so, Plaintiff's Personal Viewing Information was disclosed to Facebook pursuant to the systematic process described herein. Plaintiff never gave Defendant express written consent to disclose her Personal Viewing Information.

13.   Defendant is an American media company headquartered in Saint Petersburg, Florida. Defendant develops, owns, and operates the *Tampabay.com* website, which includes a broad selection of video content posted along with their stories.

### IV.   FACTUAL ALLEGATIONS

### A.   Background of the Video Privacy Protection Act

14.   VPPA generally prohibits the knowing disclosure of a customer's video rental or sale records without the informed, written consent of the customer in a form "distinct and separate from any form setting forth other legal or financial obligations." 18 U.S.C. § 2710(b)(2)(B)(i). Under the statute, the Court may award

actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief and attorney's fees. *Id.* at § 2710(c).

15.     VPPA was initially passed in 1988 to protect the privacy of individuals' and their families' video rental, purchase and viewing data. Prior to its enactment, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." S. Rep. No. 100-599 at 7-8 (1988).

16.     Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

17.     In proposing the Video and Library Privacy Protection Act, later codified as VPPA, Senator Leahy stated that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988). Thus, the personal nature of such information, and the need to

protect it from disclosure, is the inspiration of the statute: "[t]hese activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id*.

18.    While these statements rang true in 1988 when VPPA was passed, the importance of legislation like VPPA in the modern era of data mining from online activities is even more pronounced. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[1]

19.    In this case, Defendant chose to deprive Plaintiff and the Class members of that right by systematically disclosing their Personal Viewing

---

[1] The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, http://www.judiciary. senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the21stcentury (last accessed March 15, 2022).

Information to Facebook, without providing notice to (let alone obtaining consent from) anyone, as explained herein.

**B.    *Tampabay.com's* Digital Subscriptions**

20.    To subscribe for *Tampabay.com*, users sign up for an online newsletter. *Tampabay.com* users provide their personal information, including but not limited to their name, email address, and zip code. Below is a screenshot of *Tampabay.com*'s subscription page:



21.     The Tampa Bay Times operates a website in the U.S. accessible from a desktop and mobile device at *Tampabay.com*. It also offers an App available for download on Android and iPhone devices.

22.     On information and belief, all digital subscribers provide Defendant with their IP address, which is a unique number assigned to all information

technology connected devices, that informs Defendant as to subscribers' city, zip code and physical location.

23.     Digital subscribers may also provide to Defendant the identifier on their mobile devices and/or cookies stored on their devices.

24.     When opening an account, Defendant does not disclose to its digital subscribers that it will share their Personal Viewing Information with third parties, such as Facebook. Digital subscribers are also not asked to consent to such information sharing upon opening an account.

25.     After becoming a digital subscriber, viewers have access to a variety of *Tampabay.com's* Video and Audio Media on Defendant's digital platform.

26.     Notably, once a digital subscriber signs in and watches *Tampabay.com* Video Media, the digital subscriber is not provided with any notification that their Personal Viewing Information is being shared. Similarly, Defendant also fails to obtain digital subscribers' written consent to collect their Personal Viewing Information "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer," as the VPPA requires.

**C.     Defendant Admits It Collects and Discloses Certain Personal Information of Digital Subscribers to Third Parties But Fails to Advise It Discloses Personal Viewing Information, as VPPA Requires.**

27.     The operative Privacy Policy for *Tampabay.com* states that it collects types of "Information" from its user's devices for them to access their service:

Our servers automatically collect some basic information about your computer configuration, including the type of browser and operating system you use, the resolution of your monitor, the web site that referred you, and your IP address. (Your IP address is the numerical address of the computer connected to the Internet, used to transmit requested data, such as the web page you want to view. It does not tell us who you are. It just identifies the computer being used.) We use IP addresses for systems administration purposes, to deliver our web pages to you, to tailor our ads to the interests of our users, and to measure traffic within our site. To improve our sites' interest and usefulness to users, we may send non-personally identifying information to ad networks displaying ads on our sites. When you use our website, we share information that we collect from you, such as your email (in hashed form), IP address or information about your browser or operating system, with our identity partners/service providers. Our identity partner returns an online identification code that we may store in our first-party cookie for our use in online and cross-channel advertising and it may be shared with advertising companies to enable interest-based and targeted advertising. To opt out of this use, please click here.

[…]

*While we do not share personally identifiable information about you with our advertisers except as described above*, we do aggregate information you provide with data from other users and provide pools of information about our users to our advertisers, in order to make them aware of the audiences our sites reach. For example, we may tell advertisers how many of our users are male or female or live in a certain zip code. We may tell advertisers about the habits and preferences of our users using this type of aggregated or statistical information about traffic to, from and within our sites as well.

https://www.tampabay.com/privacy (emphasis added).

28.    Defendant's statement that "we do not share personally identifiable information about you with our advertisers excepts as described above" is false. While *Tampabay.com* discloses in its Privacy Policy that it automatically collects consumer information regarding the content they consume on the website or app, it never discloses that that Defendant will share digital subscribers' private and protected Personal Viewing Information with third parties, including Facebook.

**D.     How *Tampabay.com* Disseminates Digital Subscribers' Personal Viewing Information**

**1.     Tracking Pixels**

29.     Websites and apps use Facebook's pixel and SDK to collect information about user's devices and activities and send that to Facebook. Facebook then uses that information to show the user targeted ads.

30.     The Facebook tracking pixel, also known as a "tag" or "web beacon" among other names, is an *invisible* tool that tracks consumers' actions on Facebook advertisers' websites and reports them to Facebook. It is a version of the social plugin that gets "rendered" with code from Facebook. To obtain the code for the pixel, the website advertiser tells Facebook which website events it wants to track (e.g., Video Media) and Facebook returns corresponding Facebook pixel code for the advertiser to incorporate into its website.

31.     Defendant installed the Facebook tracking pixel, which enables it to disclose Plaintiff's and Class Members' Personal Viewing Information to Facebook, because it benefits financially from the advertising and information services that stem from use of the pixel. The pixel allows Facebook to build detailed profiles about a website's users as those users browse the Internet to enable advertisers to serve them with targeted advertisements.

32.     When a *Tampabay.com* digital subscriber enters the website and watches Video Media on the website, the website sends to Facebook certain

12

information about the viewer, including, but not limited to, their identity and the media content the digital subscriber watched. Specifically, *Tampabay.com* sends to Facebook the video content name, its URL, and, most notably, the viewers' Facebook ID.

### 2. Facebook ID ("FID")

33.    An FID is a unique and persistent identifier that Facebook assigns to each user. With it, anyone ordinary person can look up the user's Facebook profile and name. When a Facebook user with one or more personally identifiable FID cookies on his or her browser views Video Media from *Tampabay.com* on the website or app, *Tampabay.com*, through its website code, causes the digital subscriber's identity and viewed Video Media to be transmitted to Facebook by the user's browser. This transmission is not the digital subscriber's decision, but results from Defendant's purposeful use of its Facebook tracking pixel by incorporation of that pixel and code into *Tampabay.com's* website or App.

34.    Defendant could easily program its website and App to prevent its users' Personal Viewing Information from being automatically transmitted to Facebook when a subscriber views Video Media. However, it is not Defendant's financial interest to do so because it benefits financially by providing this highly sought-after information.

35.     Notably, while Facebook can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID. Facebook admits as much on its website. Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile. Simply put, with only an FID and the video content name and URL—all of which Defendant knowingly and readily provides to Facebook without any consent from the digital subscribers—any ordinary person can learn the identity of the digital subscriber and the specific video or media content they requested on *Tampabay.com's* website. In other words, by obtaining a person's FID, any third-party can discover exactly which videos that person watched on Defendant's website, which is exactly the type of personally identifiable information that VPPA is intended to protect from unauthorized disclosure.

36.     At all relevant times, Defendant knew that the Facebook pixel disclosed Personal Viewing Information to Facebook. This was evidenced from, among other things, the functionality of the pixel, including that it enabled *Tampabay.com's* website and App to show targeted advertising to its digital subscriber's based on the products those digital subscriber's had previously viewed on the website or App, including Video Media purchases, for which Defendant received financial remuneration.

E.     ***Tampabay.com*** **Unlawfully Discloses Its Digital Subscribers' Personal Viewing Information to Facebook**

37.     Defendant maintains a vast digital database comprised of its digital subscribers' Personal Viewing Information, including the names and e-mail addresses of each digital subscriber and information reflecting the Video Media that each of its digital subscribers viewed.

38.     Defendant is not sharing anonymized, non-personally identifiable data with Facebook, as it represents. To the contrary, the data it discloses is tied to unique identifiers that track specific Facebook users. Importantly, the recipient of the Personal Viewing Information—Facebook—*receives the Personal Viewing Information as one data point*. Defendant has thus monetized its database by disclosing its digital subscribers' Personal Viewing Information to Facebook in a manner allowing it to make a direct connection—without the consent of its digital subscribers and to the detriment of their legally protected privacy rights.

39.     Critically, the Personal Viewing Information Defendant discloses to Facebook allows Facebook to build from scratch or cross-reference and add to the data it already has in their own detailed profiles for its own users, adding to its trove of personally identifiable data.

40.     These factual allegations are corroborated by publicly available evidence. For instance, as shown in the screenshot below, a user visits

*Tampabay.com* website and clicks on an article titled "Watch our new video series highlighting Florida's untold stories" and watches the video in the article.



*Pictured above: The article titled* "Watch our new video series highlighting Florida's untold stories" *(taken from the Tampabay.com website on or about January 16, 2023).*

41.     As demonstrated below, once the user clicks on and watches the video in the article, *Tampabay.com* sends the content name of the video the digital subscriber watched, the URL, and the digital subscriber's FID to Facebook.



*HTTP single communication session sent from the device to Facebook, reveals the video name, URL and the viewer's FID (c_user field)*

42.    As a result of Defendant's data compiling and sharing practices, Defendant has knowingly disclosed to Facebook for its own personal profit the Personal Viewing Information of Defendant's digital subscribers, together with additional sensitive personal information.

43.    Defendant does not seek its digital subscribers' prior written consent to the disclosure of their Personal Viewing Information (in writing or otherwise) and its customers remain unaware that their Personal Viewing Information and other sensitive data is being disclosed to Facebook.

44.    By disclosing its digital subscribers Personal Viewing Information to Facebook—which undeniably reveals their identity and the specific video materials

they requested from Defendant's website—Defendant has intentionally and knowingly violated VPPA.

## F.   Defendant Does Not Need to Disclose Personal Viewing Information to Operate its Website and App

45.    Tracking pixels are not necessary for Defendant to operate *Tampabay.com's* digital news publications and sign-up digital subscriptions. They are deployed on Defendant's website for the sole purpose of enriching Defendant and Facebook.

46.    Even if an on-line news publication found it useful to integrate Facebook tracking pixels, Defendant is not required to disclose Personal Viewing Information to Facebook. In any event, if Defendant wanted to do so, it must first comply with the strict requirements of VPPA, which it failed to do. As noted above, even Facebook forbids the disclosure of such information without first complying specifically with VPPA (and relevant state laws).

## G.   Plaintiff's Experiences

47.    Plaintiff Jennifer Waller has been a digital subscriber of *Tampabay.com* from approximately 2018 to the present. Plaintiff became a digital subscriber of *Tampabay.com* by providing, among other information, her name, address, email address, IP address (which informs Defendant as to the city and zip code she resides in as well as her physical location), and any cookies associated with her device. As part of her subscription, she receives emails and other news from *Tampabay.com*.

18

48.     Plaintiff has had a Facebook account since approximately 2012. From 2018 to the present, Plaintiff viewed Video Media via *Tampabay.com's* website and App.

49.     Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose her Personal Viewing Information to Facebook. Plaintiff has never been provided any written notice that Defendant discloses its digital subscribers' Personal Viewing Information, or any means of opting out of such disclosures of her Personal Viewing Information. Defendant nonetheless knowingly disclosed Plaintiff's Personal Viewing Information to Facebook.

50.     Because Plaintiff is entitled by law to privacy in her Personal Viewing Information, Defendant's disclosure of her Personal Viewing Information deprived Plaintiff of the full set of benefits to which she was entitled as part of being a *Tampabay.com's* digital subscriber.

## V.     CLASS ACTION ALLEGATIONS

51.     Plaintiff brings this action on behalf of herself and all others similarly situated as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (the "Class"):

> All persons in the United States with a digital subscription to an online website and/or App owned and/or operated by Defendant that had their Personal Viewing Information disclosed to Facebook by Defendant.

Excluded from the Class are Defendant, their past or current officers, directors, affiliates, legal representatives, predecessors, successors, assigns and any entity in which any of them have a controlling interest, as well as all judicial officers assigned to this case as defined in 28 USC § 455(b) and their immediate families.

52.     <u>Numerosity</u>. Members of the Class are so numerous and geographically dispersed that joinder of all members of the Class is impracticable. Upon information and belief, hundreds of thousands of members of the Class are widely dispersed throughout the United States. Class members can be readily identified from Defendant's records and non-party Facebook's records.

53.     <u>Typicality</u>. Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and members of the Class were harmed by the same wrongful conduct by Defendant in that Defendant caused Personal Viewing Information to be disclosed to Facebook without Plaintiff's or Class members' obtaining express written consent. Plaintiff's claims are based on the same legal theories as the claims of other Class members.

54.     <u>Adequacy</u>. Plaintiff will fairly and adequately protect and represent the interests of the members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class. Plaintiff is represented by counsel with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically.

55.   <u>Commonality</u>. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Classes include:

(a)   Whether Defendant knowingly disclosed Class members' Personal Viewing Information to Facebook;

(b)   Whether the information disclosed to Facebook concerning Class members' Personal Viewing Information constitutes personally identifiable information under the VPPA;

(c)   Whether Defendant's disclosure of Class members' Personal Viewing Information to Facebook was knowing under the VPPA;

(d)   Whether Class members consented to Defendant's disclosure of their Personal Viewing Information to Facebook in the manner required by 18 U.S.C. § 2710(b)(2)(B); and

(e)   Whether the Class is entitled to damages, punitive damages, reasonable attorneys' fees and other litigation costs reasonably incurred, and other preliminary and equitable relief as the court determines to be appropriate, as a result of Defendant's conduct.

56.  Superiority. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## VI.    CLAIM FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710

57.  Plaintiff incorporates paragraphs by reference as if fully set forth herein.

58.  VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifying information" concerning any consumer to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C § 2710.

59.  As defined in 18 U.S.C. §2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental,

sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials."

60.   Defendant is a "video tape service provider" as defined in 18 U.S.C. §2710(a)(4) because it engaged in the business of delivering audiovisual materials that are similar to prerecorded video cassette tapes and those sales affect interstate or foreign commerce.

61.   As defined in 18 U.S.C. §2710(a)(3), "personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

62.   Defendant knowingly caused Personal Viewing Information, including FIDs, concerning Plaintiff and Class members to be disclosed to Facebook. This information constitutes personally identifiable information under 18 U.S.C. §2710(a)(3) because it identified each Plaintiff and Class member to Facebook as an individual who viewed *Tampabay.com* Video Media, including the specific video materials requested from the website.

63.   As defined in 18 U.S.C. §2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged in the preceding paragraphs, Plaintiff subscribed to a digital *Tampabay.com*

plan that provides Video Media content to the digital subscriber's desktop, tablet, and mobile device. Plaintiff is thus a "consumer" under this definition.

64.     As set forth in 18 U.S.C. §27109(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner." Defendant failed to obtain informed, written consent under this definition.

65.     In addition, VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendant failed to provide an opportunity to opt out as required by VPPA.

66.     Defendant knew that these disclosures identified Plaintiff and Class members to Facebook. Defendant also knew that Plaintiff's and Class members' Personal Viewing Information was disclosed to Facebook because, *inter alia*, Defendant chose, programmed, and intended for Facebook to receive the video content name, its URL, and, most notably, the digital subscribers' FID.

67.     By disclosing Plaintiff's and the Class's Personal Viewing Information, Defendant violated Plaintiff's and the Class members' statutorily protected right to privacy in their video-watching habits. *See* 18 U.S.C. § 2710(c).

68.     As a result of the above violations, Defendant is liable to the Plaintiff and other Class members for actual damages related to their loss of privacy in an amount to be determined at trial or alternatively for "liquidated damages not less than $2,500 per plaintiff." Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

## VII.   RELIEF REQUESTED

69.     Accordingly, Plaintiff, on behalf of herself and the proposed Class, respectfully requests that this Court:

(a)     Determine that this action may be maintained as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and declare Plaintiff as the representative of the Class and her counsel as Class Counsel;

(b)     Declare that Defendant's conduct as described herein violates the federal VPPA, 18 U.S.C. § 2710(c)(2)(D);

(c)     Order Defendant to pay $2,500.00 to Plaintiff and each Class member, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

(d)     Order Defendant to pay punitive damages, as warranted, in an amount to be determined at trial, 18 U.S.C. § 2710(c)(2)(B);

(e)     Order Defendant to pay prejudgment interest on all amounts awarded;

(f)     Order Defendant to pay restitution and all other forms of equitable monetary relief;

(g)     Provide for injunctive relief as pleaded or as the Court may deem proper; and

(h)     Enter an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit, 18 U.S.C. § 2710(c)(2)(C).

## VIII.   JURY DEMAND

70.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of herself and the proposed Class, demands a trial by jury on all issues so triable.


Dated:        January 18, 2023          Respectfully submitted,

                                        **SHAMIS & GENTILE, P.A.**

                                        */s/ Andrew J. Shamis*
                                        Andrew J. Shamis, Esq.

Florida Bar No. 101754
ashamis@shamisgentile.com
Edwin E. Elliott, Esq.
Florida Bar No. 1024900
edwine@shamisgentile.com
14 NE 1st Ave., Suite 705
Miami, FL 33132

**EDELSBERG LAW,  P.A.**

*/s/ Adam A. Schwartzbaum*
Adam A. Schwartzbaum, Esq.
Florida Bar No. 93014
adam@edelsberglaw.com
Scott Edelsberg, Esq.
Florida Bar No. 100537
scott@edelsberglaw.com
20900 NE 30th Avenue
Aventura, FL 33180